UNITED STATES of America

v.

Harry Dale PETERSON

No. CR. 203–0118.

United States District Court, D. South Carolina, Charleston Division.

Nov. 25, 2003.

Jill HaLevi, Charleston, S.C., for defendant.

## ORDER

NORTON, District Judge.

This matter is before the court on defendant's motion to dismiss the indictment and defendant's motion to suppress evidence seized from his residence. At a hearing on November 18, 2003, this court heard testimony and issued oral rulings from the bench. The court now sets forth the basis for its oral rulings.

### I. Background

The defendant, Harry Dale Peterson, was indicted on January 15, 2003, under 18 U.S.C. § 2252A(a)(5)(B) for knowingly possessing "a computer, computer disks, and other materials that contained images of child pornography, as defined in [18 U.S.C. § 2252(8)(A)] that had been mailed, shipped and transported in interstate commerce..." The defendant moved to dismiss the indictment on the grounds that the statute under which he was indicted is unconstitutional under the First and Fifth Amendments to the United States Constitution. Defendant also moved to suppress evidence gathered against him on the grounds that a computer repairman committed an unconstitutional search and seizure of his property, and that a subsequent search warrant was issued and executed i) without probable cause, ii) without a nexus between the alleged criminal activity and the place to be searched, and iii) on the basis of stale information.

### II. Facts

On April 4, 2002, the defendant, Harry Dale Peterson, took his computer to the Summerville Computer Center at 975 Bacons Bridge Road in Summerville, South Carolina, because it would not power up.

Rhett DeHart, Charleston, S.C., for plaintiff.

Peterson was told that it would take about 45 minutes to diagnose the problem, so he left saying that he would return shortly. Before he left, Peterson filled out (or had an employee fill out) a customer information sheet to be associated with the computer he left behind. On that sheet, Peterson gave his home address as the appropriate contact location. Harry Griffin, the repairman on duty, then began to set up the computer for diagnosis and repair. (The following rendition of events is taken from a letter that Griffin wrote to the police following Peterson's visit to the repair store. The letter is not an affidavit though portions of it form the basis for the affidavit Detective Adams swore out to obtain the search warrant, and the letter was attached to the affidavit that was submitted to the magistrate.) During set-up, Griffin noticed that the voltage switch on the back of the computer was not set up for a standard United States plug, i.e., it was on 230v rather than 115v. Griffin flipped the switch and the computer started up immediately.

In the startup, however, Griffin noticed an error in the boot sequence and undertook to fix the error. Once the computer finished loading its settings, Griffin noticed several adult links to web sites on the desktop including one entitled "Lolitas Live," another entitled "Underage [something he does not recall] XXXXXXX," and then other sites referring to teen or teenage boys. Griffin claims that in his continued search to find and fix the problem that was causing the boot error, he came across files in the "My Documents" section with male names on them. Griffin opened one of the files, which revealed an image of a "young male, completely nude, pasted to the document." Griffin further claims that he "immediately closed the file and continued to search for the errant program."

Griffin says that he then remembered news stories that reported computer stores were required by law to report "evidence of child pornography to the Police." He then "decided to 'investigate' a little deeper." Griffin opened several files under the "My Documents" section that revealed "pictures of pre-pubescent boys . . . in various stages of undress." He also found video clips of "males masturbating," but he states, "I could not see faces in either clip, so I have no sure idea how old the participants were." Griffin decided to copy some of the files to give to the police because he was "unsure of what to do next."

By this time, Peterson had returned to the store (it had been thirty minutes since Peterson had left), and asked how the diagnosis was going. Griffin explained that he had fixed the power problem and was researching the boot error. Peterson said that the boot problem did not concern him and asked for the computer back. Griffin complied with his request.

Griffin later called the police regarding the incident. Four days later, based on Griffin's statements to Detective Wendy Adams, the police obtained a state court search warrant to search Peterson's residence. The police went to Peterson's residence on April 9 in order to execute the warrant. Peterson was not at home, so the police waited for approximately two hours before forcing entry to his apartment. Peterson arrived as the police were completing the execution of the warrant.

## III. Motion to Dismiss the Indictment

Defendant claims that the statute under which he was indicted, 18 U.S.C. § 2252A(a)(5)(B), is unconstitutional because it violates his rights under both the First and Fifth Amendments to the United States Constitution.

## A. The First Amendment

The First Amendment to the United States Constitution commands

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. amend. I. Defendant bases his First Amendment challenge on the United States Supreme Court case *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), which held that "the mere possession of obscene matter cannot constitutionally be made a crime." *Id.* at 559, 89 S.Ct. 1243. In *Stanley*, the Court struck down a criminal statute that made it illegal to possess obscene material even within the privacy of one's own home. The Court, at least in part, based its holding on the First Amendment noting "mere categorization of [material] as 'obscene' is insufficient justification for such a drastic invasion of personal liberties guaranteed by the First and Fourteenth Amendments." *Id.* at 565, 89 S.Ct. 1243.

The Court made clear in *Stanley*, however, that it struck down the Georgia statute in large part because of the justification put forward by Georgia in defense of the statute. *Id.* at 565–66, 89 S.Ct. 1243. The Court categorized Georgia's moral arguments about the subject-matter of the material as nothing more "than the assertion that the State has the right to control the moral content of a person's thoughts," and declared that such an assertion was "wholly inconsistent with the philosophy of the First Amendment." *Id.* Later decisions distinguished that justification from the one put forward in cases involving statutes outlawing the possession of child pornography. *See Osborne v. Ohio*, 495 U.S. 103, 108–09, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (distinguishing a state's

"compelling" interest in destroying the economic market for the exploitative use of children from a state's "paternalistic" interest in regulating the minds of its citizens).

Defendant in the present case seeks to have this court find 18 U.S.C. § 2252A(a)(5)(B), part of the Child Pornography Prevention Act of 1996 ("CPPA"), found unconstitutional based on the Supreme Court's reasoning in *Stanley* and in light of its recent decisions in *Ashcroft v. The Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002), and *Lawrence v. Texas*, — U.S. —, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). In so doing, this court would essentially have to ignore the Supreme Court case of *Osborne v. Ohio*, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990), which it cannot and will not do.

While it is true that standing precedent prohibits criminal punishment for the mere possession of obscene material, child pornography does not enjoy the same degree of First Amendment protection as obscene material. In *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), approximately thirteen years after *Stanley*, the Supreme Court noted that it was undertaking its "first examination of a statute directed at and limited to depictions of sexual activity involving children," implicitly acknowledging a distinction between speech affecting children and mere obscenity. *Id.* at 753, 102 S.Ct. 3348. Likewise, for the first time the Court held that "States are entitled to greater leeway in the regulation of pornographic depictions of children" calling the States' interest in safeguarding the well-being of minors "compelling" and of "surpassing importance." *Id.* at 756–57, 102 S.Ct. 3348. The Court took judicial notice of the serious problem of the exploitation of children on the rise in society, *id.* at 749, 102

S.Ct. 3348, and concluded that the *distribution* of material containing child pornography was "intrinsically related to the sexual abuse of children in at least two ways." *Id.* at 759–60, 102 S.Ct. 3348.(1) The materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by circulation of the materials, and (2) the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled. *Id.* at 760, 102 S.Ct. 3348. Furthermore, the Court stated that First Amendment protections can be limited when a balancing of interests so demands, and in the case of child pornography, "the balance of competing interests is clearly struck and...it is permissible to consider [child pornography] as *without the protection of the First Amendment"*. *Ferber,* 458 U.S. at 764, 102 S.Ct. 3348 (emphasis added).

Eight years after *Ferber,* in *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990), the Supreme Court addressed the precise issue of whether a state could punish the *possession* of child pornography by a citizen in a private setting in light of the *Stanley* decision. *Id.* at 108, 110 S.Ct. 1691. The Court cautioned strongly that "*Stanley* should not be read too broadly." *Id. Osborne* yet again distinguished cases involving child pornography from those involving merely obscene material, *id.* at 108–09, 110 S.Ct. 1691, and found that *Stanley* itself left open the government's ability to regulate possession of material in a private setting when compelling interests so demanded. *Id.* at 110, 110 S.Ct. 1691. It held that the state's interest in safeguarding the physical and psychological well-being of minors was compelling, and that the same justifica-

tions involved in punishing the distribution of child pornography in *Ferber* were also involved in punishing the possession of child pornography in the case before it. *Id.* at 109–11, 110 S.Ct. 1691. As a result, the Court held that Ohio could "constitutionally proscribe the possession and viewing of child pornography." *Id.* at 111, 110 S.Ct. 1691.

Defendant cites *Ashcroft v. The Free Speech Coalition,* 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002), for the proposition that the Supreme Court has now ruled "that there are activities involving child pornography that are constitutionally protected." (Def.'s Motion to Dismiss 4.) In *Ashcroft,* the Court invalidated sections of the CPPA that defined child pornography to include "sexually explicit images that appear to depict minors but were produced without using any real children." *Id.* at 240, 122 S.Ct. 1389. Significantly, the Court stated that it was being asked whether it was constitutional to proscribe speech that is "neither obscene under *Miller* nor child pornography under *Ferber."* *Id.* As alluded to, *Ferber* contemplated images made using actual minors as "child pornography." *Id.* at 241, 122 S.Ct. 1389. Because the definition of child pornography at issue in *Ashcroft* did not involve actual minors, the Court said that the justifications for the invasion on free speech were not present, i.e., the rationales of *Ferber* and *Osborne* were not applicable. *Id.* at 245–251, 122 S.Ct. 1389.

In the instant case, defendant is charged with possession of material that involves actual minors. In other words, the reasons that justified the alleged infringement on First Amendment rights in *Ferber* and *Osborne*[1] are applicable to the present case. There is nothing in

---

**1.** The Court never actually acknowledged that there was a First Amendment interest in viewing and possessing child pornography in *Os-* borne, but only assumed it for the sake of argument. *Osborne,* 495 U.S. at 108, 110 S.Ct. 1691.

*Ashcroft* to indicate that the Court was prepared to start recognizing a First Amendment protection for child pornography involving actual minors. Because the reasoning behind *Ashcroft* is not applicable, and because the cases of *Ferber* and *Osborne* allow for the prohibition of the possession of child pornography, defendant's motion to dismiss the indictment on the grounds that it violates the First Amendment is denied.

## B. The Fifth Amendment

■ The Fifth Amendment to the United States Constitution provides, in pertinent part, "No person shall be...deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. Defendant argues that the recent Supreme Court case of *Lawrence v. Texas*, —— U.S. ——, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), weighs in favor of holding 18 U.S.C. § 2252A(a)(5)(B) unconstitutional under the Fifth Amendment.

In *Lawrence*, the Court struck down, as violative of the Due Process clause of the Fourteenth Amendment, a Texas statute that made it unlawful for two persons of the same sex to engage in certain intimate sexual conduct.[2] *Id.* at 2475, 2484. Defendant argues that the Supreme Court's protection of Lawrence's right to privacy in certain sexual activities in his own home should be extended to include a right for defendant to possess and view child pornography in his own home. There is no language to suggest that the Court already has or that it will extend this protection to the possession of child pornography. To the contrary, there is language and reasoning to suggest that the Court would decline any opportunity to recognize such an extension.

In *Lawrence*, the Court noted that the state and courts should avoid interfering in private *relationships* "absent injury to a person or abuse of an institution the law protects." *Id.* at 2478. The Court sought to protect the privacy interests of consenting adults to choose the boundaries of their relationships. It recognized that the only legitimate historical precedent for a state regulating such a private interest involved "predatory acts" such as an adult against a minor. *Id.* at 2479. The Court was careful to point out over and over that the protected activity "does not involve children," *id.* at 2484, but "consenting adults" engaged in "private acts." *Id.* at 2479. As pointed out in the analysis under the First Amendment, the present case is distinguishable because the Court has recognized that the possession of child pornography is harmful to minors if actual minors were used in its production. In short, *Ashcroft* and *Lawrence* were based on the protection of rights that free people possess in activities where there are no victims. The Supreme Court has repeatedly recognized that children are victims of child pornography and the mere possession of that pornography causes them continued harm by creating a market and by perpetuating a record of the events. For these reasons, *Lawrence* does not provide a rationale for the extension of Due Process protection for possessors of child pornography, and defendant's motion to dismiss the indictment on the grounds that it violates the Fifth Amendment is denied.

## IV. Motion to Suppress

■ Next, defendant argues that the government's evidence should be sup-

---

**2.** Because *Lawrence* involved a state statute, the Fourteenth Amendment was the applicable provision, but because defendant in the present action was charged under a Federal statute, he argues for application of the Fifth Amendment.

pressed as the product of an unconstitutional search of his home. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." *California v. Carney*, 471 U.S. 386, 390, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). Violations of the Fourth Amendment can lead to the suppression of evidence obtained by the illegal search under the exclusionary rule established by the United States Supreme Court in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and made applicable to the states by *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), whereby evidence obtained in violation of the Fourth Amendment proscription of unreasonable searches and seizures may not be used against an accused.

### A. Private Searches

■ While the Fourth Amendment does protect against unreasonable searches and seizures by government officials and "those private individuals acting as 'instruments or agents' of the Government," *United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir.2003); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), it does not provide protection against "searches by private individuals acting in a private capacity." *Jarrett*, 338 F.3d at 339 (citing *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)) (holding that the Fourth Amendment is "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official" (internal quotation marks and citations

omitted)). For that reason, any evidence secured by private searches, even if illegal, need not be excluded from a criminal trial. *Jarrett*, 338 F.3d at 339 (citing *Walter v. United States*, 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) ("'[A] wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and ... such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." (internal citations omitted))).

In *Jarrett*, the Fourth Circuit recognized that

[d]etermining whether the requisite agency relationship exists necessarily turns on the degree of the Government's participation in the private party's activities, ... a question that can only be resolved in light of all the circumstances. This is a fact-intensive inquiry that is guided by common law agency principles. The defendant bears the burden of proving that an agency relationship exists.

*Jarrett*, 338 F.3d at 344 (internal punctuation and citations omitted). In order for that relationship to exist and hence for the Fourth Amendment to be implemented, the government "must do more than passively accept or acquiesce in a private party's search efforts," instead the government must exert some degree of participation in the search. *Id.* The Fourth Circuit has identified two pertinent factors to be examined in deciding whether a search is private: (1) whether the government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation. *Id.* The defendant must show both in order for a court to find the agency relationship exists. *Id.* at 345.

■ With regard to the first factor, "evidence of Government encouragement or

participation is of course relevant in determining the existence of the first factor, i.e., Government knowledge and acquiescence sufficient to make a private person a Government agent," but it is not necessary in order to find the agency relationship exists. *Jarrett*, 338 F.3d at 345 n. 3. Defendant's only argument that the government knew of or acquiesced in Griffin's search is a South Carolina statute that defendant alleges "may be seen as promoting such searches, and as such constitutes a blanket acknowledgment and endorsement of searches by computer technicians." (Def.'s Motion to Suppress at 2.) The South Carolina statute in question states

> Any retail or wholesale film processor or photo finisher who is requested to develop film, and any computer technician working with a computer who views an image of a child younger than eighteen years of age or appearing to be younger than eighteen years of age who is engaging in sexual conduct, sexual performance, or a sexually explicit posture must report the name and address of the individual requesting the development of the film, or of the owner or person in possession of the computer to law enforcement officials in the state and county or municipality from which the film was originally forwarded. Compliance with this section does not give rise to any civil liability on the part of anyone making the report.

S.C. CODE ANN. § 16–3–850. This statute does not instruct computer technicians to search or investigate, but merely requires technicians to report the identity of the owner or possessor of the computer if they discover child pornography on the computer. Had Griffin never opened any of the files and never said anything to the police, he would not have been in violation of the statute. It cannot be said that the language of this statute shows that the government knew of and acquiesced in Griffin's search to the point of making Griffin

an agent of the government. Indeed, there has been no suggestion that the government had any knowledge of this particular search prior to Griffin's undertaking it.

Because defendant cannot meet his burden under the first factor of showing that the government knew of and acquiesced in Griffin's search, Griffin was not acting as an agent for the government, and it is not necessary to analyze the second factor. Because Griffin was not acting as an agent for the government, the search was private and did not violate the Fourth Amendment; therefore, the evidence from the search is admissible against defendant.

### B. The Search Warrant

Next, defendant argues that the search warrant issued to law enforcement agents based on Griffin's contact with police and Detective Adams' affidavit was defective for a number of reasons.

### i. Probable Cause Challenge

■ Courts favor the pursuit of warrants by law enforcement agents before they undertake searches. *Jones v. United States*, 362 U.S. 257, 270, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The Supreme Court has recognized that a magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Furthermore, a "grudging or negative attitude by reviewing courts toward warrants...is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Ill. v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal punctuation and citations omitted). Courts should not invalidate warrants by reviewing affidavits with hypertechnical standards in mind; instead, courts should use commonsense standards and resolve

disputes in favor of the preference for warrants. *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

■ Defendant claims that there was not sufficient evidence to issue the warrant because the witness, Griffin, could not tell if the boys in the pictures were underage. The government counters that Griffin's letter referred to nude boys that were "pre-pubescent" and some of the internet links were entitled "Underage xxxxxxx." In light of the strong presumption in favor of warrants, and in light of the common sense approach used in testing the validity of those warrants, the magistrate had enough information to issue the warrant. The magistrate had a direct statement from an eye-witness that the computer in question contained pictures of pre-pubescent boys in various stages of undress and other boys (unidentifiable as to age) engaged in sexual acts together with links to "underage" internet sites. Together these facts were enough evidence for the magistrate, using the common sense totality of the circumstances test, to find that there was probable cause that defendant's computer contained items subject to seizure.

### ii. Nexus Between the Alleged Activity and the Place that was Searched

■ Next, defendant claims that there was no evidence to suggest that the pictures on the computer had any relationship to defendant's residence; therefore, the warrant lacked a sufficient nexus between the basis for the search and the place to be searched. Fourth Circuit precedent holds that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States v. Anderson,* 851 F.2d 727, 729 (1988). The Fourth Circuit has also recognized that when reviewing a search war-

rant, "the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *United States v. Lalor,* 996 F.2d 1578, 1582 (4th Cir.1993) (citing *Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978)).

In the present case, Griffin claimed that defendant "left the store to go home and get his computer" after a conversation about the problem with the computer. The government asserts that this direct statement by the witness, together with a common sense argument that computers are usually stored in the home, provide a sufficient nexus between defendant's residence and the evidence observed on the computer. Furthermore, the computer was a "desktop," not capable of easy mobility, and the images were of a private nature, all suggesting that the computer was likely maintained in a private residence.

### iii. Whether the Information was Stale

■ "[T]ime is a crucial element of probable cause." *United States v. McCall,* 740 F.2d 1331, 1335 (4th Cir.1984). "A valid search warrant may issue only upon allegations of 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" *Id.* at 1335–36 (quoting *Sgro v. United States,* 287 U.S. 206, 210–11, 53 S.Ct. 138, 77 L.Ed. 260 (1932)). The test must be determined by the circumstances of each case. *Id.*

■ In the present case, the search warrant was issued five days after the disclosure of the evidence to the police. Other Circuits have upheld searches for child pornography based on information much older than five days. *See United States v. Lacy,* 119 F.3d 742, 745–46 (9th Cir.1997) (upholding a search based on

information that was ten months old, but also based on expert testimony that child pornographers keep their contraband for a long time). Other Circuits have also noted the pattern of child pornographers to keep their contraband. *See United States v. Ricciardelli*, 998 F.2d 8, 12 n. 4 (1st Cir. 1993) (noting that "history teaches that collectors prefer not to dispose of their dross, typically retaining obscene materials for years").

As evidence that the information was stale, defendant only puts forward Griffin's observation that defendant was in a hurry when he left the repair store and thus would likely not keep the computer in a readily accessible place. Defendant's staleness argument is without merit and does not defeat the magistrate's determination of probable cause.

#### iv. The Good Faith Exception

 Finally, the government asserts that the good faith exception applies to save the search even if the warrant was deficient. "Under the good faith exception to the warrant requirement, evidence obtained from an invalidated search warrant will be suppressed only if 'the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" *Lalor*, 996 F.2d at 1583 (quoting *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3430, 82 L.Ed.2d 677 (1984)).

Defendant merely asserts that the officers were reckless in the preparation of the warrant because there was no nexus between defendant's residence and the alleged crime. While that argument was addressed above, section IV(B)(ii), *supra*, the government's case is even stronger under the good faith exception. At the suppression hearing, Detective Adams testified that she had additional information, unknown to the magistrate, that defendant

had given his residential address to Griffin at the repair shop as contact information to be associated with the computer. This information totally undermines the proposition that Detective Adams was dishonest or reckless in her preparation of the affidavit or in her reliance on the warrant.

### V.   Conclusion

For the foregoing reasons, it is therefore, **ORDERED**, that defendant's motion to dismiss the indictment is **DENIED**, and defendant's motion to suppress is also **DENIED**.

**AND IT IS SO ORDERED.**